ROCKY MOUNTAIN PIPE LINE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42666. Filed September 20, 1956.

*Donald P. Moyers, Esq.*, for the petitioner.
*Allen T. Akin, Esq.*, for the respondent.

1090

## OPINION.

Raum, *Judge:* Respondent's position is that while the petitioner commenced business during the base period it is not entitled to the relief sought, or any excess profits tax relief, because a reconstruction of base period net income, on the evidence of record, would not produce excess profits credit equal to that allowed by respondent under section 713 (f), the so-called growth formula. Petitioner's average base period net income, computed under section 713 (e), is $204,035.04 for 1940 (under the Revenue Act of 1940), and $241,196.83 for the years 1941 and 1942 (under the 1941 Act). Petitioner's average base period net income, computed under section 713 (f), is $424,910.37 for 1940, and $536,395.77 for the other years. The computation under section 713 (f) results in increases in petitioner's average base period net income of $220,875.35 for 1940, and $295,198.94 for the years 1941 and 1942. The relief claimed by the petitioner is based on an average base period net income of $803,185.87 for 1940 and $961,899.25 for 1941 and 1942.

The petitioner has submitted a proposed reconstruction based on the operation of its pipeline at full rated capacity of 12,000 barrels of oil per day, which it contends it would have reached by the end of 1939 if it had commenced business 2 years earlier than it did. This volume is allocated to the several different outlet points on the line according to petitioner's actual 1939 experience and gross revenue computed at the established rates for each of such points. Operating costs were estimated on the basis of petitioner's actual 1938–1939 experience, with certain adjustments for the increased production.

Respondent offers several objections to petitioner's proposed reconstruction of base period earnings. He contends that there was not sufficient production at the Lance Creek field during the base period to supply petitioner with enough crude oil to operate its pipeline at full capacity and that petitioner had reached a level of normal earnings by the end of the base period.

The evidence is that at the end of 1939 there were ample oil reserves in the Lance Creek field and that the refineries which petitioner's pipeline served had sufficient capacity to handle all of the oil petitioner could transport. However, the volume of petitioner's business depended, we think, on two principal factors, the production at Lance Creek and the demands of the refineries for crude oil. Undoubtedly, these factors depended to a great extent on the prevailing prices for crude oil and refined oil products. We do not know what these prices were during the base period years. There is no question that the producers and the refineries were capable of stepping up production to meet the demands on the industry whenever prices for oil products were favorable.

As we see it, the chief objection to petitioner's proposed reconstruction of average base period net income is the assumption that it would have been operating at full rated capacity of 12,000 barrels per day by the end of 1939 if it had begun business 2 years earlier than it did. The number of barrels transported by petitioner in December 1939, after 14 months of operation, averaged 9,633 barrels per day. There had been ample time for the Lance Creek production to reflect whatever increase was to result from the additional transportation facilities made available by petitioner's pipeline, particularly since the principal refineries served by petitioner were controlled by petitioner's stockholders. With substantially the same capacity, petitioner's volume of business increased from a daily average of 4,903 barrels in January 1939 to 9,633 barrels in December of that year. Over the same period, the estimated daily average production of the Lance Creek field increased from 12,960 barrels to 28,890 barrels. The percentage of total production transported by petitioner remained about the same throughout 1939, about 40 per cent. Lance Creek production reached

a peak of 9,234,058 barrels in 1940, of which petitioner transported 4,276,930 barrels.

It is not shown what portion, if any, of the increase in the Lance Creek production was due to the additional transportation facilities furnished by petitioner's pipeline or at what rate production would have increased if petitioner's pipeline had been available 2 years earlier. Petitioner was tied in, through ownership of its stock, both with some of the principal Lance Creek producers and the refineries. Production was controlled by the principal producers under their unitization agreement. We are not persuaded by petitioner's argument that if its pipeline had been put into operation 2 years earlier the refineries which it served would have increased their capacity.

Except for the opinion testimony of petitioner's former president, who was also a retired vice president of Continental Oil Company, and other interested witnesses for petitioner, there is little support for petitioner's contention that it would have been operating at the capacity rate of 12,000 barrels per day if it had begun operations 2 years earlier than it did. We conclude on the basis of the evidence that petitioner's pipeline had reached its full development and had attained a permanent competitive position in relation to Lance Creek production by the end of 1939, and that it would not have attained a higher level of earnings at the end of the base period even if it had commenced operations 2 years earlier. We reject petitioner's contention that with 2 years of additional experience it would have operated at the rate of 12,000 barrels a day. Accordingly, the push-back rule is of no aid to petitioner here.

However, we are convinced on this record that petitioner's average base period net income is an inadequate standard of normal earnings, and that relief is therefore nevertheless appropriate. Cf. *Suburban Transportation System*, 14 T. C. 823, 829. To be sure, petitioner's situation was substantially ameliorated by section 713 (f), but we think that there has not been complete correction of the abnormality. Cf. *Southern California Edison Co.*, 19 T. C. 935, 1000–1001.

The problem of reconstruction is a difficult one, and we do not accept the one offered by petitioner in view of its fallacious assumption as to a level of operation based on 12,000 barrels a day. Using our best judgment on the entire record, and taking into account, among other factors, the potential Lance Creek production and the probable demands of the refineries which petitioner served (and which were in substantial measure controlled by the principal stockholders of petitioner), we have concluded that a fair and just amount representing normal earnings to be used for computing petitioner's excess profits credit is an amount equal to $40,000 more than petitioner's average base period net income otherwise determined without the

benefit of section 722, Internal Revenue Code of 1939, and with proper adjustment for such addition with respect to the year 1940 pursuant to section 711 (b) (1) (A).

Reviewed by the Special Division.

*Decision will be enterd under Rule 50.*